**EXHIBIT B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
KENNEY, BECKER LLP

                 Plaintiff,

            vs.

MARTIN S. KENNEY

                 Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                     AFFIDAVIT OF
                                 EUGENE S. BECKER

                                 Index No. 603614/05

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF NEW YORK  )

      EUGENE S. BECKER, being duly sworn, deposes and says:

      1.  I am a member of Kenney, Becker LLP ("plaintiff"), which at all material times hereto had its only office and place of business in the City, County and State of New York, most recently, since July 1996, at One Penn Plaza, Suite 2414, New York, New York 10119.

      2.  Plaintiff is a New York registered limited liability partnership (variously the partnership, plaintiff or KB), established by defendant and me effective June 15, 1995, and registered under the laws of this state with the Department of State of New York State, on July 27, 1995. Exhibit 1 hereto. The original name of plaintiff was changed in October 1999 by filing the relevant amendment with the Department of State of New York State. Exhibit 2 hereto. (All exhibits attached hereto are true and correct copies of the original except where otherwise noted). As of February, 2005, KB has been in dissolution, as a result of my withdrawal from said partnership by delivery of a notice of withdrawal.  Exhibit 3 hereto.

      3.  In support of plaintiff's and my cross motion to stay arbitration, I make this affidavit in my personal capacity and on behalf of plaintiff, based on my personal knowledge, except where stated to be, or the context indicates, otherwise and where so

stated or indicated, I believe those facts, matters and circumstances to be true and accurate.

4. Defendant Kenney has moved this court to compel arbitration in terms of his Notice to Arbitrate of January 6, 2006.  Defendant in said Notice seeks to have an arbitrator rewrite the "deal" as among the parties to the Partnership Agreement (PA), referenced below.  His claims are not within the scope of any arbitral provision, nor do they derive from the clear and express provisions of the PA.  Defendant Kenney seeks to rewrite referenced PA because he appears to find the express provisions onerous and disadvantageous to him.  Further, he has implicated what he says are a series of changed circumstances, relieving him (he argues) from those inconvenient express terms of the PA.  Apart from the fact that there is no legal basis for his claims as set out in the Notice to Arbitrate, concerning his intended rewrite, the circumstances that he references and argues as justifying a new deal, were in fact envisioned as among the parties hereto and expressly incorporated in the applicable contractual arrangements. His arguing for relief based on what he references as a set of changed circumstances, is a mask to attempt his rewrite.  With regard to his claim for relief as set out in prayer (a) in the Notice to Arbitrate, defendant Kenney presumes to have an arbitrator arbitrate matters that are properly before this court in another action, which defendant Kenney has omitted to identify.  In said action commenced by plaintiff herein against defendant Kenney, inter alia, plaintiff sued him for outstanding fees for services rendered. Defendant, therein and herein, was served in said action, has filed an Answer therein, and although currently in default, is participating in various pretrial matters.  Kenney's attempt to preempt this court in seeking an order (in prayer a) that his payment of $73,026 was in full satisfaction of any obligation he may have to plaintiff, was waived by his (continuing) participation in said attorney fees suit.  I refer, to the details facts, matters and circumstances set out below and as exhibited to this my affidavit.

2

**Defendant Kenney's Misstatements, et al.**

5.   I have reviewed the affidavit of defendant Martin Steven Kenney, sworn January 5, 2006 in the British Virgin Islands.  In order to prevent the opposing papers from being unduly prolix, I have refrained, except where necessary, from dealing with misstatements and mischaracterizations by defendant Kenney.  By so refraining, I do not at all waive my or plaintiff's right to address such misstatements and mischaracterizations at the appropriate time.

**The Partnership Agreement between Defendant Kenney and Me**

6.   The Partnership Agreement (PA) between defendant Kenney and me consists only in documents executed by him and by me in New York County, to wit, Manhattan, save for the Second Amendment, executed by defendant Kenney in Ireland (and by me here in Manhattan, New York County). All of the documentation constituting the PA, including said Second Amendment, was submitted in 2002 to the Bank of New York, Empire State Building Branch, 350 Fifth Avenue, New York City, for the purpose of plaintiff's securing a business credit line from said bank, personally guaranteed by me. Contrary to defendant Kenney's statements, there are no "oral agreements" between us that are part of the PA.

7.  The PA consists in the following documents:

7.1  Registered Limited Liability Partnership Agreement for Kenney, Becker Solicitors LLP, dated as of the 15th day of June 1995 between defendant Kenney and me (the "1995 Agreement"),

7.2 the First Amendment and Modification to Registered Limited Liability Partnership Agreement for Kenney, Becker Solicitors LLP, dated as the first day of July 1996 ("the 1996 Amendment" or "the First Amendment"), and the

7.3 Second Amendment and Modification to Registered Limited Liability Partnership Agreement for Kenney, Becker Solicitors LLP, now known as

3

<u>Kenney, Becker LLP dated as of January 1, 2001,</u> ("the Second Amendment") including as an exhibit thereto <u>MEMORANDUM OF A MEETING AMONG MARTIN KENNEY, EUGENE BECKER AND BERNARD MEDOFF HELD AT THE OFFICE M.R. WEISER & CO LLP ON THE EVENING OF FEBRUARY 24, 1997</u> (variously, the "1997 Memorandum" or the "1997 Meeting"). Said documents are attached in their entirety hereto as composite **Exhibit 4** hereto. The First and Second Amendments were signed by defendant Kenney, plaintiff and me. Exhibit 5 hereto is a copy of Mr. Medoff's letter of February 27, 1997 to defendant Kenney and me enclosing a copy of referenced 1997 Memorandum.

**<u>Salient Terms of the Partnership Agreement</u>**

8.   Defendant Kenney's submission herein has nothing to do with, nor is based on, the PA, other than that he purports to inform why the PA does not at all apply. I am advised that the appropriate substantive submissions concerning defendant Kenney's extra- or non-contractual arguments and his declination to avail himself of the PA will be made on behalf of plaintiff and this deponent. I set out certain express terms of the PA. In the instances referenced, defendant Kenney treats them and, so ultimately, the PA as now non-existent.

9.   In the 1995 Agreement between Kenney and me, it is provided in relevant part that:

> *ARTICLE IX …*
>
> **9.6. Modifications.**   *No modification of this agreement shall be valid unless such modification is in writing and signed by both of the parties hereto…*
>
> **9.10. Title and Subtitles.** *Titles of the paragraphs and subparagraphs are placed herein for convenient reference only and shall not to any extent have the effect of modifying, amending or changing the express terms and provisions of the Partnership Agreement…*

4

**9.16 Waiver.** *No waiver of any provision of this Agreement shall be valid unless in writing and signed by the person or party against whom charged.*

**9.17 Applicable Law.** *This agreement shall be subject to and governed by the laws of the State of New York.*

**9.18 Arbitration.** *Any controversy or claim arising out of or relating to this agreement shall only be settled by arbitration in accordance with the rules of the American Arbitration Association, one arbitrator, and shall be enforceable in any court having competent jurisdiction.*

10.    As set out above the only signatories to the 1995 Agreement were defendant Kenney and I. Plaintiff was not a party to the 1995 Agreement containing the above referenced arbitration provision. Clause 21 of the First Amendment generally adopts the "Miscellaneous" provisions of the 1995 Agreement. There was no specific intent on behalf of plaintiff to incorporate the provisions for arbitration in the First Amendment. Further, none of the parties to the arbitration provision or the PA ever agreed or contemplated that the International Centre for Dispute Resolution (ICDR) should be the forum for any applicable dispute under the PA. In addition, none of the parties to the arbitration provision or the PA ever agreed or contemplated that any proper arbitration reference should be venued in Miami.

11. I respectfully set out the following extracts from the 1996 Agreement.

**8.0** *Although is it not, at present, envisaged that there shall be any Extra-Partnership Work, should it be relevant, and should it be consistent with applicable law and legal professional ethical rules, the Partners shall agree on a list of current or prospective client matters that shall make-up the corpus known as Extra-Partnership Work.*

**9.0** *In the event that, after 1 July 1996, either ESB or MSK choose to perform Extra-Partnership Work, they must (i) notify the other in this regard, by memorandum (or another writing), and (ii) make their own arrangements concerning the servicing of the clientele which will be the subject of such Extra-Partnership Work.*

**15.0** *Notwithstanding anything in this First Amendment to the contrary, should it be such that either one of ESB or MSK is permitted, under applicable legal professional ethical rules, to conduct Extra-Partnership Work, while the other is prohibited from indulging in such, the parties hereby agree that the Partner who is entitled and able to pursue that manner of legal professional work (as defined*

5

in this First Amendment) shall not so indulge without the prior written assent of the other.

**18.3(v)** ... It is expected that MSK will perform professional services for Interclaim, Ltd. at the Present Offices and ESB will perform professional services for Interclaim, Ltd. at the Present Offices or at the Premises; however, to the limited extent that MSK undertakes Partnership-related work and/or professional services at the Present Offices, all such work and/or services shall inure to the benefit of the Partnership and MSK shall promptly provide the Partnership with copies of all correspondence, faxes or other relevant documentation for retention in the Partnership's files at the Premises. ... In the event of such relocation or in the event of the completion of the Second Offering, the Partnership shall have the right, but no the obligation, to continue to use the KENNEY, BECKER, SOLICITORS LLP for its business, and MSK shall retain his capital account in the Partnership and receive 1% of the profits and losses of the Partnership. ...

**18.3(xv)** Upon the closing, in the event that such takes place, of the full capitalization of Interclaim, Ltd., in the minimum aggregate sum of US$10,000,000, it may be the position that MSK will move to Bermuda or to such other location as may be notified by him or Interclaim, Ltd., at that time. Upon and in the event of the capitalization in the minimum aggregate sum of US$10,000,000 or the relocation of MSK as aforesaid, MSk's profits and losses interest in the Partnership shall decrease by operation of this First Amendment automatically to 1%, and conversely ESB's profits and losses interest in the Partnership shall automatically increase to 99%. ...

**22.0** The Partnership having commenced on 15 June 1995, shall continue for 15 years from 15 June 1995, unless earlier terminated pursuant to (i) this First Amendment, (ii) applicable New York State law, or (iii) upon the death, insanity, bankruptcy, retirement, withdrawal, resignation, expulsion or disability of any one of the Partners.

**24.0** All of the representations, warranties, acknowledgments, covenants or agreements set forth in the Recitals to this First Amendment shall be binding upon the parties hereto.

12.   Defendant Kenney and I have since 1995 and at all times material hereto been partners of plaintiff. In early 1996, defendant Kenney, one Aviv, an Israeli-born investigator, based in New York, and I discussed over lunch at a Manhattan hotel the idea of forming a company that could finance (or assist therewith) the investigation, litigation and recovery of difficult claims and judgments or ones that might otherwise have to be abandoned because of actual or perceived problems with their collection. Defendant Kenney and Aviv pursued discussions, furthered plans therefor and took

action by engaging consultants and accountants, including M. R. Weiser & Co. LLP (as it was then known, now Weiser LLP) of New York City, and counsel, including the New York City office of McDermott, Will & Emery. The name of the company was Interclaim by general description. (A layered corporate structure was contemplated) The founding entity was incorporated in Bermuda in April 1996, with Kenney, Aviv and one other as original shareholders with interests of 40%, 25% and 25%, respectively. I held a 10% interest at that time.

13.   From shortly after referenced 1996 meeting with Aviv, defendant Kenney spent most of his work time and effort on Interclaim, to establish and finance it. My focus and interest were the development of plaintiff and servicing our clients. By the summer of 1996 plaintiff had become busier with several matters entrusted to it. On client-related matters, plaintiff worked with distinguished counsel in New York and elsewhere, including the Amsterdam office of Baker & McKenzie and the New York firm, Robinson, Silverman (now Bryan, Cave) as counsel of record, as well as employing attorneys and paralegals. All my time was focused on plaintiff while virtually all of defendant Kenney's was on Interclaim and related matters.

14.   By approximately the summer of 1996, the advice defendant Kenney had received with respect to Interclaim included the need for him to move to another jurisdiction for, inter alia, the fiscal efficiency of the fledgling (Interclaim) corporate arrangements.   To account for our different focuses within the partnership and making provision for our (defendant Kenney and this deponent) maintaining our respective interests in Interclaim and practice, we entered into the First Amendment in the summer of 1996, as of July 1, 1996.

15.   The detail of the express contractual arrangements is set out in the PA in all its constituent parts. I do not preempt the plain meaning and legal effect of these detailed arrangements. The intention of the parties to the PA, including its amendments,

7

was to maintain the professional and business connections as among them, as the recitals to the First Amendment demonstrate. Each of defendant Kenney and this deponent had and maintained small interests in the primary focus of the other-defendant Kenney in plaintiff and this deponent in Interclaim. The architecture in the First Amendment, in particular, and the relevant constitutive documents for Interclaim, reflected said position. It was not at all clear that Interclaim would be financed and, if so, whether it would be a viable business. (In the event, it failed) The same was true about the plaintiff at the time.

16.    The First Amendment's provisions concerning extra partnership work (EPW) were plainly designed to ensure that there was transparency in EPW dealings were EPW to be relevant.  Apart from the financial aspects of engaging in EPW or not, and the partners' respective interest therein, defendant Kenney and I, prior to execution of the First Amendment, were aware of and had discussed several issues that related to EPW, were such to become relevant. These considerations concerning EPW existed prior to the formulation of the First Amendment and the execution thereof. (See infra)

17.    In defendant Kenney's non-recognition of the PA's terms governing EPW, in particular, he has wrongfully omitted to tell this court what the context for EPW was and what the partners tried to accomplish in their drafting and behavior. Such wrongfulness and lack of candor are disappointing marks on defendant Kenney who is obliged to uphold himself as a model of honesty, to act with integrity and be respectful of the process of the courts of this state, in light of the fact that he touts himself as a Legal Consultant, licensed in New York.

18.    As to EPW, ethically we wanted to be sure that there was no breach with what was envisioned with any of the applicable professional rules. The EPW provisions provided for this.

8

19. Professionally there had to be clarity and transparency between the partners as to what they were doing and what was intended to be done and serviced as EPW, were this to be relevant. The EPW provisions provided for this. In terms of the conduct of partnership and related matters (which included EPW) the partners needed to know what the other was doing and to be appropriately informed as to whether and to what extent the action and decision-making of the other impacted plaintiff and themselves inter se. The EPW provisions expressly included the contractual obligation for the one partner to inform the other where EPW was contemplated.

20. Professionally, it was important for plaintiff and the partners to ensure that there would be no conflicts of interest involved in any representation under this EPW rubric. In terms of plaintiff's professional liability and other insurance obligations and disclosures, the partners and plaintiff had to be mindful of these matters, were EPW to become relevant. We were cognizant of not unwittingly putting our professional liability insurance in jeopardy because of decisions that might be taken with respect to EPW, inter alia. We had the perception that professional liability insurers were difficult to deal with when it came to small firms and our, and where appropriate, insurers' decisions about EPW (among other matters) would weigh in relation to disclosure and continuing coverage.

21. Informing the obligation of partners' disclosure as fiduciaries, the EPW provisions and matters relating to practice responsibility were the following underlying facts that existed prior to execution of the First Amendment: (a) defendant Kenney's relative inexperience in legal practice, and (b) his uncritical reliance on two consultants acting as investigators in client matters.

22. As to (a), the sum of defendant Kenney's legal professional experience when I met him in 1992 amounted, as I then understood it, to his work as a corporate advisor (in Phoenix), some criminal defendant experience when he worked or interned in law

chambers in Canada, and simple commercial debt collection. When the New York office of Bermans, the firm where we met, was consulted by a Canadian financial institution about a more complicated "collection" involving the apparent misappropriation of several million dollars involving, inter alia, English common law jurisdictions, I informed defendant Kenney and the supervising partner at Bermans of several relatively recent, and by then established, English law causes and devices to consider for recovery. Prior to my employment by Bermans in 1992, I had had more than ten years of professional experience with these and other causes and devices in practice. These matters were not novel so much as they were unknown to or unappreciated by Bermans' New York office and unknown to defendant Kenney. In the event, said causes and devices were variously employed in successful recovery efforts with which Bermans was called on to assist. Defendant Kenney's legal professional experience remains by his own admission limited since he says he was not practicing during the years 1997 through 2002.

23.    As to (b), defendant Kenney, while at Bermans, extensively used a consultant called John Quirk who touted himself as an investigator and uncritically used the fruits of this person's reporting in advice to clients and further actioning. My impression was that this state of affairs resulted from defendant Kenney's relative lack of professional experience. I saw actual and future problems with the lack of verification and attention to detail and accuracy that were the signature of this consultant's work. In establishing plaintiff, defendant Kenney expressly assured me that he would not work with Quirk and this person did not at all work with plaintiff. However, defendant Kenney, at Bermans, also developed a relationship with a Long Island resident (hereinafter SS) who purported to have extensive investigatory ability and facilities. Defendant Kenney consulted SS in the early days of the establishment of plaintiff (about 1995). The content and verification of his reporting were problematic and caused problems with certain

matters. When it became apparent to me that we ought not to be working with SS, I raised this with defendant Kenney, with little success initially.

24.  In the lead up to the First Amendment, defendant agreed however that he had seen the error of working with SS and his own mode of working and promised not to do so in the future, where relevant. While I do not recall further activity with this person within the context of plaintiff, I became aware of SS' consulting with Interclaim and I sought and received advice from Mr. Medoff of Weiser about this. The principal practice responsibility would be mine, as it came to be incorporated in the First Amendment.

25.  Contrary to defendant Kenney's assertions about the lack of any need for the provisions of the PA (as of an arbitrary date in February 1997) which he does not like and finds onerous, the referenced facts and circumstances were germane to the drafting of the First Amendment (and the EPW provisions, as relevant), and their continuing application until dissolution of the Partnership.

26.  Contrary to defendant Kenney's false assertions that "[p]rior to 19th February, 1997, Mr. Kenney was the partner who was principally responsible for, in part, [sic] marketing the services of the Partnership to prospective clients;[sic] and the principal procuring cause of the sale of legal services on its behalf" (Kenney paragraph 17), I found that, from shortly after referenced meeting with Aviv in early 1996, I was almost solely managing the partnership's affairs, including servicing current clients, communicating with and marketing to prospective clients, developing legal professional and other relationships with providers in New York and elsewhere, and ensuring the financial probity of plaintiff, among other matters. Most of plaintiff's long-term relationships with various parties and providers dated from this time onward and were the result of my efforts and focus on the business and practice of plaintiff. Through the date of dissolution of plaintiff in February 2005, these parties included law firms in New York, Chicago, elsewhere in the United States, Canada and Europe, accountants and

11

consultants in New York, and consultants elsewhere in the United States and overseas. The First Amendment expressly recorded the fact of the foregoing circumstances that:

> *MSK has spent approximately three months to assist divers professionals in the formation of Interclaim, Ltd., ...while ESB has continued to service then existing and new clientele of the Partnership during this period, and both ESB and MSK continue in their respective endeavours.*

(Second recital, page 1 of the First Amendment)

27.    Defendant Kenney's continuing in 1996 to enjoy the financial and other benefits of his interest in plaintiff, while focusing his effort on the Interclaim enterprise was a drain on plaintiff in terms of the time available that defendant Kenney was able to work on client matters and otherwise to promote the interests of plaintiff. We discussed these matters and subsequently reached agreement as set out in the First Amendment.

28.    Contrary to defendant Kenney's false assertions of his focus on partnership matters prior to February 1997 (as referenced herein and in, for example, Kenney 17 and 18), for the reasons, inter alia, set out above, the 1996 First Amendment expressly recorded Kenney's focus on the Interclaim enterprise (as of and prior to July 1996). For example, I refer to the extract from the second recital on page 1 of the First Amendment (supra) and to the first recital on page 2 of the First Amendment (infra), as well as to the following expressly recorded:

> *WHEREAS, it is the case that MSK has been in large measure, focussing, (sic) and will continue to focus, on the establishment, formation, capitalization and other relevant and related matters concerning Interclaim, Ltd;*

> *WHEREAS, it is the case that whether or not the First Offering of Interclaim, Ltd. Is successfully completed, timeously (meaning by 22 July 1996...) MSK shall have limited time to spend on Partnership matters, but instead will be focusing his attention on completing the Second Offering, in performing his duties as a principal corporate officer of Interclaim, Ltd*

(Second and third recitals on page 3 of the First Amendment)

29.    Contrary to defendant Kenney's false assertions of his "effective withdrawal" from the partnership in February 1997 (e.g. Kenney 18, 39, 40), a characterization that is neither based in law or fact, the written agreement between the parties hereto, more

particularly in the form of the First Amendment, expressly envisioned as of July 1996, inter alia, the circumstances leading to defendant Kenney's move from New York and the decrease in his partnership interest in plaintiff.  I refer to the above-quoted extracts and as a further example, the first recital on page 2 of the First Amendment that provides:

> WHEREAS, an important event has occurred which has given rise to ESB's and MSK's desire to enter into this First Amendment. This event relates to the recent formation (to wit: 30 April 1996) of a company formed in accordance with the laws of the Islands of Bermuda, known by the appellation, Interclaim, Ltd….Should the First and Second Offerings be successful, and be completed within the scheduled eight month period commencing the effective date of this First Amendment (to wit: 1 July 1996), MSK will, on or about such event, be required to move to…Bermuda or to another locale to assume the position of President of [Interclaim]. In such event and only in such event, it is agreed, he shall thereafter hold a nominal interest in the Partnership, not exceeding 1% of the profits, losses and his capital interest (whatever its measure) of the Partnership, should it then be subsisting.

30.  In was in light of the 1996 (and not as defendant Kenney falsely states, 1997) factual circumstances referenced herein that the matter of EPW and the expressly agreed extra-partnership work provisions were considered and incorporated in the First Amendment. Contrary to defendant Kenney's attempt to re-write the PA and in particular to whiteout the express obligations he had under the First Amendment and as fiduciary as a partner, his rewriting of the deal concerning EPW is false and wrong. Writing a new, hoped-for arrangement between the parties hereto, defendant Kenney wishes away the existence of the EPW provisions in the First Amendment as somehow overtaken by events- inter alia, the 1997 meeting at M.R. Weiser's offices, the decrease in his partnership interest in plaintiff and his impending move from New York.

31. In his re-writing, defendant Kenney states that the EPW provisions in the First Amendment "no longer subsisted or endured due to the effective withdrawl (sic) of Mr. Kenney from the Partnership (save for his nominal or inactive 1% interest..)". There is no provision in the PA, nor yet in the First Amendment, nor yet in the 1997 Memorandum,

concerning any support for this assertion.  That assertion is false. There is no legal and no factual basis for this false assertion.

32. The EPW provisions were expressly agreed by defendant Kenney and this deponent in the 1996 First Amendment. They were introduced as follows:

> *Further, ESB and MSK have agreed, subject to applicable law and legal professional ethical rules, to ...memorialize their agreement to the effect that there may subsist a separate sub-species of Sole and Separate Work, where they shall each have the right to conduct Sole and Separate Work, separate and apart form, and not under the aegis or the name of the Partnership (hereinafter called, Extra-Partnership Work).*
> Second Recital on page 1 of the First Amendment

33.  Defendant Kenney in his intended redrawing of the arrangement between the parties to the PA and in particular the express obligations under the First Amendment has ignored his position as a partner of plaintiff, and he has to and did ignore the following express obligations concerning EPW.

> *"should it be relevant, and should it be consistent with applicable law and legal professional ethical rules, the Partners shall agree on a list of current or prospective client matters that shall make up the* **corpus** *known as Extra-Partnership Work."*
> **Clause 8.0 Extra-Partnership Work- the First Amendment**

Defendant Kenney in his intended redrawing ignores-

> *"In the event that, after 1 July 1996, either ESB or MSK choose to perform Extra-Partnership Work, they must (i) notify the other in this regard, by memorandum (or another writing)…*
> **Clause 9.0 of the First Amendment**

34. Defendant Kenney in his intended redrawing seeks in prayer (c) a declaration that, effective February 19, 1997, the EPW provisions ceased to exist and that he "has no obligation to account [to plaintiff or me]… for any Extra-Partnership Work or legal professional income of MKS" or defendant Kenney because of (i) defendant Kenny's "effective withdrawl" (sic) from the partnership, allegedly in February 1997, and (ii) defendant Kenney's assertion that he had at all material times the right to establish a new legal practice and that plaintiff and I do not have ownership or other interest in any

14

new practice of his. These are new Kenney-intended terms for an arrangement that does not exist and did not exist at any time. There are no provisions whatsoever in the PA (or anywhere else) that provide any basis for the purported relief claimed in this prayer. Any right that defendant Kenney may have to establish a new practice does not and did not dislodge the express obligations he has under the PA. Any possible lack on my part of any ownership interest does and did not dislodge the express obligations defendant Kenney has under the PA.

35. Further, defendant Kenney, in his attempt to re-write now the express terms of detailed contractual arrangements written and agreed upon years ago, seeks in prayer (d) a declaration to the effect that he has no obligation to account to the plaintiff or me "for his provision of legal services between 1 October, 2002 and the date of the dissolution of the Partnership of 17th February 2005, on the grounds that (xx) Mr. Kenney was the sole procuring cause of the sale thereof, (yy) Mr. Becker had no involvement or participation in the procurement of such sales, and (zz) the income earned therefrom is the sole and separate property of Mr. Kenney as mandated by clause 8.0 of the First Amendment". Here, too, there is no contractual basis at all in the extensive contractual arrangements as among the parties hereto to support such a claim. The notional proposition that defendant Kenney was the sole procuring cause of the sale of legal services and the notional proposition that the income earned therefrom is his sole and separate property, do not dislodge defendant Kenney's express obligations under the PA. This is an intended re-writing by defendant Kenney of the deal among the parties to attempt to support his repudiation of his obligation to account that he has been called on and that he presumably feels is too onerous to comply with.

36. In defendant Kenney's campaign for his abnegation of the PA, defendant Kenney makes the express allegation (in paragraph 42) that plaintiff is a "façade" and

has been since February 1997. This is a further term of the intended re-writing campaign by defendant Kenney that is not anywhere referenced in, or supported by, the PA.

37.   Defendant Kenney places reliance (in paragraph 42) on, and refers to, an "oral agreement" reached between the parties in February 1997 at the offices of M. R. Weiser & Co. LLP, as part of his re-writing of the deal as among the parties to the PA. There is no oral agreement that forms part of the underlying contractual arrangements as among the parties (see the PA supra). The "tenor" of the parties' arrangements and the "intention of the parties" (see, Kenney 42) to the PA are set out in the PA.

38.   Defendant Kenney says (in paragraph 42) that when he "agreed to the dilution (sic) of his 50% interest to a de minimus (sic) 1% stake in the Partnership, he did so on the basis of an oral agreement made with" me at a meeting on February 24, 1997. There is no contractual provision that supports the foregoing. As set out above, Kenney's agreement to decrease his interest to a 1% stake to take effect upon certain events, was expressly provided for in the 1996 First Amendment. The 1997 February meeting at Mr. Medoff's offices took place in context of and in conformance with the express contractual arrangements of the parties hereto. Although the 1997 Memorandum forms part of the PA and therefore is a part of the written contractual arrangements as among the parties hereto, no contractual amendment was reached at the 1997 meeting, as the 1997 Memorandum attests.

39.   Following on the February meeting at M.R. Weiser, the 1997 Memorandum set the effective date for the decrease of defendant Kenney's interest in plaintiff to 1% (February 19, 1997) and dealt with certain housekeeping matters.

40.   The 1997 Memorandum referenced by defendant Kenney (paragraph 42) came about because of the matters envisioned in the 1996 First Amendment- the partners' differing focuses in 1996, the formation of Interclaim and related matters, the Kenney move from New York, the diminution of defendant Kenney's interest to 1%, the

16

continuation of plaintiff, and other matters- supra. In the first two months of 1997 in particular, plaintiff had (a) received payments on client matters in early 1997 and (b) issued invoices to clients for services rendered in the aggregate of hundreds of thousands of dollars for both (a) and (b). Apart from some work on client-related matters during January 1997, defendant Kenney remained committed time- and otherwise to the Interclaim enterprise, a position that had existed from many months earlier. Defendant Kenney was continuing to benefit considerably from the activities of plaintiff, while Interclaim was coming to fruition. February 1997 was the eighth month referenced in the first recital on page 2 of the First Amendment (supra). It was time to put into effect the provisions of the PA- the 1995 Agreement and the 1996 First Amendment.

41.    In light of the PA and the terms of the EPW provisions set out above, defendant Kenney misleads by stating that (in Kenney 38) clauses 8.0 and 9.0 of the First Amendment provided for a "procedure to follow" where EPW was to be performed from the New York City offices of plaintiff. The referenced Kenney-claimed "protocol" does not appear in these clauses or anywhere else in the PA. Rather, defendant Kenney's new language consists in a redrawing of the EPW provisions to attempt to facilitate his avoidance of his obligations as a partner of plaintiff and those expressed in the PA.

42.    Contrary to defendant Kenney's implication (Kenney 39 and 37 (sic), page 17) that plaintiff or I had an obligation to seek information about his practice or related matters, the PA and the EPW provisions speak for themselves, in particular about what the parties hereto are to do when EPW is contemplated.  There is no such Kenney-claimed obligation on plaintiff or me under the PA.

43.    Fundamentally, defendant Kenney attempts to write a new deal that is very different from the PA.  This "deal" does not exist and has not ever existed as among the parties to the PA. His claims in these respects revolve around having an arbitrator re-

17

write the terms of the PA to suit him since he clearly views them as onerous. There is no basis in the PA for this. The parties to the PA did not at all agree to such a procedure, nor to any of the Kenney hoped-for terms that he sets out at length in his affidavit and are relevantly dealt with here. Defendant Kenney's notice to arbitrate does not interface or align itself with the express terms of the PA and applicable law.

## Defendant Kenney's Status As A Partner Of Plaintiff And His Peripatetic Existence

44. The context of defendant Kenney's peripatetic existence, adverted to by him in his affidavit, is set out here, to the best of my knowledge. Upon information and belief, defendant Kenney worked in Phoenix for about four years in the 1980's for a Canadian national who had to flee that jurisdiction and the United States for overseas, I believe England, because of that person's possible or actual association with a large questionable loss sustained by one of his entities.

45. Defendant Kenney then spent about one year in England, and about five in New York, before he moved to Ireland in 1997 to act as President of Interclaim. Interclaim was never profitable.  Within a short period of time following the move to Ireland (2001), Interclaim was placed in bankruptcy.  Its business model as an intervenor for profit in claims and judgments opened it to charges that were partly successful that its conduct was champertous and/or offended the doctrine of maintenance.  According to defendant Kenney, he moved from Ireland to the British Virgin Islands in August of 2005 and so has been living there for a few months, and that appears to be his residence for the time being.

## Suit Pending Before This Court Against Defendant Kenney For Legal Fees

46. Defendant Kenney does not mention the following salient facts concerning the below referenced action instituted by plaintiff for outstanding legal fees owing by him.

47. On or about April 12, 2005, Plaintiff issued suit out of this Court in New York County by Summons and Complaint against defendant Kenney for legal fees owing by

18

him as a result of services rendered at his request by plaintiff. That matter remains pending before this Court. In that matter defendant Kenney was served with process and and has, since service, appeared in said suit. He has filed and served an Answer and has sought discovery from plaintiff (therein and herein). Said suit for outstanding legal fees owed by defendant Kenney arose out of services rendered by plaintiff out of its offices in the city, county and state of New York during the years 1999 to 2002. Discovery and other pretrial matters are in process with respect to said suit for legal fees. Attached hereto as composite exhibit are copies of the attorney fees' Summons and Complaint and defendant Kenney's Answer. Exhibit 6.

**Status Of Plaintiff And Related Matters**

48.  Plaintiff was at all material times hereto a New York Registered Limited Liability Partnership in good standing with two partners at all times material- defendant Kenney and this deponent. It has filed and is current with all Federal, New York State and City filings, taxes and charges from the time of its first year of operation, 1995, through the present. The most recent filing was April of 2005 and the next is expected for April of this year.

49. At all material times through the present, plaintiff has caused to be prepared by its accountant, and issued, the requisite K-1 forms to the partners and accounted for the proper allocation of profit or loss for all tax years through the present (1995 to 2004; 2005 is currently in preparation).

50.  Plaintiff's accountants were for the years 1995 and 1996 (and for part of 1997) Weiser LLP (then known as M. R. Weiser LLP, of 12th floor, 135 West 50th Street, New York City, and since 1997 through the present, Baron, Bergstein & Weinberg, of 450 Seventh Avenue, 29th floor, New York City. Both firms of accountants hold accounting and other books and records of and referable to plaintiff and plaintiff's

operations, including matters that are material and necessary to the disputes herein and that which defendant Kenney variously references in his affidavit.

51.  In addition, Mr. Bernard (Buddy) Medoff, a resident of Manhattan and senior partner of Weiser LLP and based at its Manhattan office at West 50th Street, is the person who (i) conducted the meeting at Weiser's offices in 1997 with defendant Kenney and me, (ii) authored the subsequent memorandum relating to said meeting with defendant Kenney and me, (iii) conducted and oversaw the inquiry in 2005 into defendant Kenney's deficit in his capital account, and (iv) communicated with the parties hereto and supervised Weiser's employees as to the foregoing and other matters as well as plaintiff's accounting, audit and financial matters when Weiser was its accountant.

52.  Further, Mr. Medoff was the supervising partner at Weiser LLP advising and providing professional services to the Interclaim enterprise that defendant Kenney references at length in his affidavit and is referenced in the PA.  He has communicated with the parties hereto about the same and has material and necessary evidence about matters referenced in this action.

53.  Mr. Joel Agler, a resident of Nassau County in the State of New York, of the referenced accounting firm, Baron, Bergstein and Weinberg, based at its only office in Manhattan, supervised his firm's employees and performed professional services relating to plaintiff's accounting, audit and financial needs, including those matters referenced by defendant Kenney, specifically without limitation (a) the accounting and resolution in 1998 of the deficit in defendant Kenney's capital account with plaintiff, (b) the "dispute" raised by defendant Kenney in 2004 and 2005 concerning the same, (c) the resolution of defendant Kenny's "dispute" in 2005 by Mr. Agler's attendance with, and provision of relevant support to, Mr. Medoff. Mr. Agler and his firm have been in communication with the parties hereto about said matters and, in addition, was, according to defendant Kenney, a service provider with respect to defendant Kenney's

practice. Upon information and belief, Mr. Agler and his firm were requested by defendant Kenney in 2004 to prepare defendant Kenney's personal tax filings for New York and/or federal compliance. Upon information and belief, Mr. Agler and said firm continue to provide service to defendant Kenney, inter alia, with respect to New York and/or federal tax preparation and filings. Mr. Agler and his firm have evidence that is material and necessary to the matters referenced in this action, including matters variously referenced by defendant Kenney.

54.  Belinda L. Williams, Esq., an attorney admitted before this court, a former employee of plaintiff, a resident of this state and employed in Manhattan, and former employee Alan Harris, a resident of this state in Westchester County, have information concerning matters relevant to this action, including matters referenced herein and by defendant Kenney. These material and necessary matters include defendant Kenney, Mr. Cohen (see below) and Interclaim's relationship with plaintiff and me, Kenney's business dealings and business and living arrangements in Ireland, and other relevant matters.

55.  Plaintiff was placed in dissolution by my withdrawal from the partnership by notice dated February 17, 2005. Exhibit 3. Plaintiff had not at any time prior to said notice been placed in dissolution, nor had any of the partners of plaintiff, to wit, defendant Kenney and this deponent, withdrawn from plaintiff prior to said notice.

56.  Defendant Kenney admits that he enjoyed the benefits of the jurisdiction of New York by using at least one New York bank account as a repository in plaintiff's trust account. Most of the payment transfers from said account were to a defendant Kenney-related entity who or which was, on information and belief, a New York citizen and/or had banking account/s established and operating in this county. The appropriate and relevant records concerning referenced party, transactions and account/s are in New York State and the relevant subpoena addressees are in possession of evidence that is

material and necessary to the issues raised in this action and are going to have to provide said records responsive to the matters raised in this action, including by defendant Kenney. Upon information and belief, defendant Kenney continues to control and maintain said entity and or account/s and further maintained at least one personal bank account in Manhattan, at Bank of Tokyo, during most or all of the time he was living in Ireland.

57.   Defendant Kenney's current counsel, Joe Lilly, and former Interclaim officer, Irving Cohen, have non-privileged material and necessary evidence about and relevant to the matters in this action and that which defendant Kenney references, including without limitation, the establishment and subsequent failure of Interclaim, the personal and business arrangements Kenney effected with respect to the same, his reference to and use of and relationship with plaintiff and me while resident in New York and after he left. Mr. Lilly is a resident of this state in Nassau County and maintains an office in Manhattan. Mr. Cohen moved from New York to Ireland to work with defendant Kenney in the failed enterprise of Interclaim and spent several years there before moving back and establishing residence in this state after Interclaim's bankruptcy.

58.   Contrary to defendant Kenney's assertion that he had withdrawn from the partnership in February 1997, there is no provision in the PA or any document to support said assertion. Further, defendant Kenney over a large period of time variously touted his partnership and co-founding status of plaintiff and thereby his association with it without qualification beyond February 1997. In addition, it is unclear whether and to what extent he remains involved in the affairs of the bankrupt Interclaim or a corporation so-called. Exhibit 7 hereto. As recently as December 2005, defendant Kenney referenced his co-founding and partnership status, at least through August 2002, five years after his purported "withdrawal" from plaintiff and 2.5 years before mine. Exhibit 8 hereto.

22

59.   Contrary to defendant Kenney's assertion that there is an "oral" agreement that was valid between the parties that somehow in 1997 he ceased to be a partner of plaintiff and that plaintiff was a façade and therefore non-existent, in addition to the materials referenced above and attached thereto, I refer to his affirmative citation of plaintiff's office address as linked to him.   Exhibit 9 hereto.   As recently, defendant Kenney held out the link to and/or association with plaintiff in his Martindale-Hubbell listing for 2004.

60.   In addition to the other New York sitused facts referenced herein, I refer to the first page of a complaint against, inter alia, defendant Kenney issued out of the United States District Court for the Eastern District of New York.   Upon information and belief, said action against defendant Kenney remains pending.   Exhibit 10.   Further, defendant Kenney in his passport, issued July 2001, cited plaintiff's address at One Penn Plaza as his "permanent address". Exhibit 11.

61.   This is not at all an "international dispute" as defendant Kenney wrongly describes it. This is a New York dispute, subject to the laws of the State of New York about a New York registered limited liability partnership with New York books and records and New York witnesses and professional providers and all, but one of the parties, New York citizens and residents.   Under the ICDR rules, they provide for their application, only where applicable, where the parties have specifically contemplated said rules.   As I have mentioned, none of the parties to the PA and the arbitration provision agreed to the forum of the ICDR and its rules nor to any venue of any appropriate arbitration in Miami.

62.   As part of defendant Kenney's rejection of the PA and his attempted re-writing of the PA as he now wishes it to read, he selects a forum that was never contemplated by the parties or the PA. He avoids the language of the arbitration provision and the (inapplicable) rules of the ICDR itself in his selection. At the time that

the parties hereto executed the 1995 Agreement, containing the arbitration provision, they had no contemplation at all that the International Dispute Resolution Centre would be the dispute resolution body, were it the case that there were arbitrable disputes between the parties. Nor was such body in contemplation by the parties at any subsequent time the First or Second Amendments were executed or at any other time. Upon information and belief, in any event, the International Centre for Dispute Resolution was founded at some point in 1996, according to its website (exhibit 12).

63. I attach as exhibit 13 a copy of a letter received from defendant Kenney's counsel dated June 24, 2005 in response to my demand for information concerning Mr. Kenney's post July 1996 legal services.

64. I attach as exhibit 14 a copy of a letter dated January 10, 2006, plaintiff's and my counsel received from ICDR concerning the purported proceeding filed with it.

65. It is true that defendant Kenney has not received his 2004 income allocation of $1,126. It is unclear as of the swearing of this affidavit what the allocation to Kenney will be for 2005. As mentioned the requisite accounts and documents are in process of preparation for April 15, 2006 filing.

66. In the circumstances, on behalf of plaintiff and myself, I move that defendant Kenney's motion to compel be dismissed and for other relief.

                                         _____
                                                EUGENE S. BECKER

Sworn to before me this
30th day of January 2006

_____
       Notary Public

STEPHEN LATZMAN
Notary Public, State of New York
No. 02LA4618508
Qualified in Nassau County
Commission Expires Oct. 31, 20 06

24