UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
KENNEY, BECKER LLP AND
EUGENE S. BECKER,

                              Plaintiffs,

         v.

MARTIN S. KENNEY,

                        Defendant.
--------------------------------------------------------X

**AFFIDAVIT OF
EUGENE S. BECKER**

06 Civ. 2975 (JSR)

STATE OF NEW YORK      )
                         ) ss.:
COUNTY OF NEW YORK   )

       EUGENE S. BECKER, being duly sworn, deposes and says:

    1.     I depose to this affidavit individually and in my capacity as a member of Kenney, Becker LLP (KB) (in dissolution) in opposition to Defendant Kenney's Motion for Sanctions and other relief.

    2.     In addition to addressing the reckless allegations that Defendant has made, I refer to a selection of matters that demonstrate Mr. Kenny's wrongful pattern of conduct in these and other proceedings as among the parties (in New York State Supreme Court, New York County, the "Legal Fees case"). It is Plaintiffs' submission that Defendant's serial dishonesty and his misconduct (as illustrated in part herein) constitute a deliberate plan by him to attempt to occupy the time, effort and resources of this court and Plaintiffs and divert our respective focuses from the substantive disputes between the parties.

    3.     This motion is Kenney's collateral and wrongful fire storm attack. He does not want ventilation of the information in the bank records sought by the North Fork subpoena so that he can try to smother Plaintiffs' submissions that the Gymway entities referenced in the

1

subpoena, are not and were not arm's length to this Defendant, that Plaintiffs had concerns about the propriety of the Kenney and Gymway transactions, that these transactions do not relate to work allegedly done by Kenney, that they do not depose to any knowledge imputable to me that I somehow knew Kenney's clients and that he somehow complied with his obligations under the parties' Partnership Agreement (PA), all issues that have been or will be raised in the arbitration hearing commenced on November 26, 2007.

4.     Further, Defendant Kenney is particularly motivated to divert attention from Plaintiffs' concerns about the propriety Gymway documentation (Exhibits 8 & 10) he produced prior to and on the first day of the hearing of the arbitration, November 26, 2007. It is Plaintiffs' submission that this documentation was created by Defendant Kenney in response to the arbitral directive of November 13, 2007, and does not and did not form part of the ordinary course records of the (Defendant-owned) Gymway entities or Defendant's firm.

5.     As the declaration of Stephen Latzman, Esq. and this affidavit will demonstrate, Defendant's motion has been filed for an improper collateral purpose.  That purpose is to create a diversion from the issues that should occupy the parties and the various tribunals seized of this matter.  As will be shown in this affidavit, Defendant Kenney regularly uses this fire storm approach to litigation.  The motion is meritless, wrong and moot and is contrary to the standstill agreement that the parties hereto reached on Thursday, November 29, 2007, to suspend the live arbitration hearing.   The subpoena that Defendant complains about was, in any event, withdrawn and not honored by the subpoena addressee.  I set out an index to the matters discussed in this affidavit:

**The Suspension of the Arbitration Hearing by Agreement**

**Defendant Kenney's Fire Storm Approach to Disputes and Litigation**

**Kenney's Fire Storm Definition of the Parties' Partnership Agreement**

**Kenney's Fire Storm on Estoppel and the Gymway Transactions, the Subject of the North Fork Subpoena**

**Kenney's Fire Storm Approach to Arbitration Venue**

**Kenney's Falsehoods Concerning the Medoff Meeting and Memorandum**

**Kenney's Falsehoods in the Legal Fees Case**

**Kenney's Fire Storm About His Capital Account Deficit That He Said Was Not Owed**

**The Suspension of the Arbitration Hearing by Agreement**

6.    On Wednesday, November 28, 2007 at approximately midday, Kenney by counsel Lilly proposed that the parties and their respective counsel attempt to narrow the issues as between them and streamline the process of the arbitral hearing which was then in its third day.  We agreed to this proposal and began discussions with Defendant Kenney and counsel, outside of the presence of the arbitrator.  Discussion between the parties soon turned to the possible settlement of all matters in dispute between them including, the State Supreme Court Legal Fees case. Defendant Kenney and I spent about five hours alone without the presence of counsel in this attempt to settle.  During the latter part of said discussion, he made an offer to me which I rejected.   The parties then resumed their appearance before the arbitrator at approximately 6pm that Wednesday evening.  Mr. Kenney said, inter alia, that the parties were in settlement discussions with each other and that he had to speak to another interested party before there might be any further development concerning settlement.  He made this statement openly to all those in attendance, including the presiding arbitrator, Mr. R. De Witt.

3

7.    After the short appearance ended, that Wednesday evening, November 28, 2007, Defendant Kenney approached me and revised his earlier off to settle all matters. I rejected the revised offer.

8.    It is clear to me that Defendant Kenney did not act in good faith at the time that his counsel proposed (Wednesday, November 28, 2007) that we narrow the issues, nor did he act in good faith at the time that we spent five hours that day discussing settlement. It is my respectful submission that Defendant Kenney was keen on avoiding his further cross examination by Plaintiffs' counsel, Stephen Latzman, Esq. His cross-examination began on the second day of the hearing, Tuesday, November 27, 2007. My observation and that of others in attendance at the hearing, was that Mr. Kenney was very uncomfortable during his cross-examination. He was confronted with a number of his fallacious propositions that he had spread in many filings in these and related proceedings over a lengthy period.

9.    On the fourth day of the arbitral hearing, Thursday, November 29, 2007, the parties came to a standstill agreement on issues relating to the further conduct of the arbitration. This agreement dealt with all issues relating to such further arbitration conduct as a result of Defendant Kenney's request to Plaintiffs to limit issues, contain costs and explore the possibility of dispositive motions. Defendant Kenney made this request after a morning of his cross-examination. Kenney requested, by counsel, that in effect the hearing be converted to a paper hearing. To this end, it was proposed by Defendant Kenney that the parties should attempt to agree such facts as they were able to and to narrow the issues for submission to the arbitrator on a briefing schedule. So, Defendant Kenney's cross-examination was interrupted. The parties and counsel worked through lunch until about 3:30pm to address the foregoing issues and actually came to an agreement for the further prosecution of the arbitration. It was expressed at

4

various points during the discussions amongst the counsel and parties, as well as by Mr. Kenney to the arbitrator that the purpose was to save costs, limit the issues, terminate the hearing and hopefully dispose of the necessity for further live hearings.  In point of fact, Kenney requested that his deposition be conducted by telephone at his office so as to save him the costs of coming to New York.  At one point he said that the extra costs of such travel could be $2,000.  In the spirit of attempting to limit costs, narrow issues and the disputes in this matter, Plaintiffs agreed that Kenney's deposition could be conducted by telephone while he was at his office.  The arbitration hearing was therefore suspended.  No future date was scheduled.

10.    I had no expectation of this motion which is contrary to the tenor and spirit of the parties' standstill agreement.  The standstill agreement derived from Mr. Kenney's request to Plaintiffs postured as it was on a possible narrowing of issues and limiting costs.  He was the main beneficiary, particularly given that he would not have to undergo further stressful cross-examination if the arbitration was disposed of.  Had I known that he would be filing this motion or taking other action contrary to the standstill agreement, I would not have agreed to the standstill.

11.    The stand-down that had been agreed to between the parties that Thursday afternoon, November 29, 2007, was just that – a cessation of the pending and contemplated proceedings subject to a briefing schedule for motions for summary judgment and to dismiss that the parties wanted to pursue.  In all the discussions as between the parties where I was present, no mention was made at all of further action or proceedings that Defendant Kenney clearly had in mind at the time and clearly wanted to take with regard to the subpoena that was issued out of this court, addressed to North Fork Bank (the North Fork Subpoena).

12.    I was therefore surprised to learn last week that Mr. Kenney filed this motion for sanctions against Plaintiffs, notwithstanding the stand-down agreement he had entered into November 29, 2007.  This Motion runs contrary to Defendant's own protestations about limiting the issues, narrowing costs and moving dispositive motions and contrary to our agreement.  The stand-still agreement that the parties negotiated and agreed precluded further process except for that set out in the agreement.

13.    I have wrestled with the following but I have decided that I must bring it to this court's attention. More than my surprise is my disgust with this Kenney as I hope it resonates with this court with respect to the following. During our "settlement" discussion on the Wednesday, November 28, 2007, each asked about the other's families. I mentioned very briefly that day that my wife was shortly to be indisposed. Defendant Kenny feigned concern. On the Thursday, November 29, 2007, when we were dealing with the scheduling of depositions as part of the stand down, I pulled this Defendant aside, in order to prevent counsel posturing, and noted that I had limited availability for deposition because of my wife's surgery and hospitalization, scheduled for later: December 13, 2007 (pre surgery examination and testing) and December 19, 2007 (the surgery and hospitalization). I noted that after the surgery I was not going to be available through the New Year. In fact, I expect I will only have very limited time in the office because of this event. Kenney again feigned concern and thereupon made a show of directing his counsel to work with my counsel and my limited availability. That is the reason for the agreement that my deposition be held in early December.

14.    Not surprisingly, Defendant Kenney does not want to be subject to continued cross-examination before the arbitrator.  He prefers, to keep to the paper route that is reflected in

the stand-down agreement, but he wants to continue to collaterally and wrongfully attack Plaintiffs in order to attempt to get some notional advantage.

15.    To recap, this wrongful motion breaches the parties' agreement to suspend the arbitral hearing, limit issues, contain costs and preclude further process. This motion, even if it were properly brought before this court, is unnecessary as a result of the suspension of the live hearing on Thursday, November 29, 2007 and Plaintiffs' withdrawal of the North Fork Subpoena.

16.    Plaintiffs have already submitted a request to the arbitrator to schedule the resumption of the arbitration as soon as possible.

**Defendant Kenney's Fire Storm Approach to Disputes and Litigation**

17.    The foregoing comments relate to Mr. Kenney's misconduct in wasting time during the scheduled arbitral hearing and pursuing this motion a part of a broader pattern by him of constructing "fire storms" in order to divert proper focus from the substantive issues and, as well, waste time and resources. I set out illustrations of Defendant Kenney's pattern of fire storms over nearly three years of litigation in connection with arbitral issues and the Legal Fees case.

**Kenney's Fire Storm Definition of the Parties' Partnership Agreement**

18.    The main issue that Defendant Kenney has placed in "dispute" with reference to the arbitration revolves around the constitution of the partnership agreement between the parties. Plaintiffs' position is simple, accurate and in accord with New York substantive law. The partnership agreement is made up of a 1995 instrument entitled "Registered Limited Liability

7

Partnership Agreement For Kenney, Becker, Solicitors LLP", dated as of June 15, 1995 (the 1995 Agreement), "First Amendment And Modification To Registered Limited Liability Partnership Agreement For Kenney, Becker, Solicitors LLP" (the First Amendment), dated July 1, 1996, and "Second Amendment And Modification To Registered Limited Liability Partnership Agreement For Kenney, Becker, Solicitors LLP, Now Known As Kenney, Becker, LLP" (Second Amendment), dated as of January 1, 2001.  These three instruments are the controlling documents and make up the Partnership Agreement (PA).

19.    It is a term of the PA that there can be no amendment except in writing (clause 9.6 of the 1995 Agreement).  It is also a term of the PA that there shall be no valid waiver unless the waiver is written and signed by the party against whom the waiver is charged (clause 9.16 of the 1995 Agreement).  It is a provision of the PA that the law of the State of New York shall govern the PA (clause 9.17 of the 1995 Agreement).

20.    Defendant Kenney, on the other hand, has created a dynamic menu of the make-up of what he says constitutes the partnership agreement.  Notwithstanding the foregoing clauses and the controlling law, Mr. Kenney contends that *his* partnership agreement is made up of the three referenced instruments *as well as* an oral agreement (and in some filings oral agreements, plural) "a new" agreement, a "superseded" agreement, waiver not subject to any writing, an amendment not subject to any writing, parties' conduct..

21.    The Kenney "partnership agreement" was a new animal and one that was not subject to arbitration.  It is clear that this Kenney-defined agreement was a cherry-picked mix of everything that he accepted from the three controlling instruments, including an arbitration provision, and also a rejection of those provisions with which he had discomfort.  As Plaintiffs

8

have submitted before this court as well as in State Court, attracting some support for its position, a new agreement or a radically changed agreement propounded by Kenney is not subject to arbitration, nor yet can it be said that it contains an arbitration provision.[1]

22.     The constitution of the partnership agreement is critical because of Kenney's failure to account for legal work he did before the dissolution of the partnership.

23.     In the arbitral proceedings are extensive arguments raised by Kenney concerning "Extra Partnership Work" (EPW).  Under the Partnership Agreement (PA), EPW is dealt with in a number of clauses and other parts.  Defendant Kenney has taken a number of positions concerning the applicability or otherwise of the EPW provisions.  Either they do not apply, he has said, or, now, possibly, they do apply but he has complied with them and/or I knew about matters that are somehow connected to his compliance or I am equitably estopped because of information that I do or do not know (for example, the Gymway transactions) but Kenney wants to impute to me.  The foregoing is as confusing as it is written, but reflects the many positions Kenney has taken to try to avoid his clear obligation to account for legal work under the PA.  Kenney's positions are serially unfaithful to the PA.

24.     In June of 2005 Plaintiff requested an accounting from Mr. Kenney of legal services performed by him through the date of dissolution of the Plaintiff partnership, February 17, 2005.  Defendant Kenney responded on June 24, 2005 by stating that: paragraph 8.0 of the First Amendment (referenced above, relating to EPW, "only addresses circumstances of performing 'extra partnership work' when Messrs. Kenney and Becker were equal partners who

---

[1] I understand that the reason we are having to address these extra-contractual, non-arbitral claims before an arbitrator is that this court referred counsel to the authority to the effect that the arbitrator will, in the first instance, determine arbitrability of issues.

shared an office". Any reading of all the component parts of the PA will not yield Defendant Kenney's quoted false proposition.

25.    Plaintiff's instituted action against Defendant Kenney in October 2005 for an accounting. Defendant Kenney's response to the accounting suit was to move to compel arbitration. He filed a statement of claim that, among other things, alleges that:

> "Mr. Kenney says that by virtue of the effect of Mr. Kenney's effective withdrawal from the Partnership as of 19th February, 1997; and based on his move from New York to Ireland; the protocol contained in the First Amendment designed to justly and fairly allocate partnership overhead costs to the partner who might perform Extra-Partnership Work from the Partnership's office premises in New York City no longer had any purpose or effect and was subsumed by the substantial reconstruction to the parties' contractual relationship effective 19th February, 1997 from '50/50'% to '99/1'% partners."

> "The Partnership's asserted entitlement to all of the fees earned by MKS or Mr. Kenney for legal professional services rendered to clients of the Claimant and his law firm is based upon false construction of a nine-year old amendment to the Partnership Agreement; in that the Respondents' construction is made completely out of context. The impugned construction is dependent upon the presence of a contractual setting where the Partnership was owned by Mr. Becker and Mr. Kenney on a 50/50 basis."

> "(c) a declaration that (i) effective 19th February, 1997, the provisions contained within the First Amendment dated 1st July, 1996 governing the carrying out of, and accounting for, Extra-Partnership Work no longer subsisted or endured due to the effective withdrawal of Mr. Kenney from the Partnership (save for this nominal or inactive 1% interest in the profits, losses and distributable cash therefrom [sic]); (ii) at all material times Mr. Kenney had the right to establish MKS as a separate legal professional practice; (iii) the Respondents have no right of ownership of or any interest in MKS; and (iv) that, as a consequence, Mr. Kenney has no obligation to account to the Respondents for any Extra-Partnership Work or legal professional income of MKS or Mr. Kenney" [emphasis supplied]."

26.    In light of the clear contractual provisions under the PA Mr. Kenney's position is not only untenable, but also constituted a rewriting of the PA. He specifically pursued his position that an "oral agreement" (agreements – see below) were part of the Partnership Agreement. Variously, Defendant Kenney asserted that from and after a February 1997 meeting

"all legal services provided by Defendant would constitute" EPW [Defendant's Memorandum of
Law in Support of Motion to Compel Arbitration and In Opposition to Cross Motion to Stay
Arbitration ¶ 28 and Kenney Affidavit signed February 6, 2006 ¶ 9); Defendant Kenney asserted
that Plaintiffs "were aware of the fact of the establishment of Defendants new law practice, MKS
in Ireland in 2002" MOL ¶30; following the February 1997 meeting with Mr. Medoff, it was,
Kenney asserted, implicit that the "protocols set forth in the First Amendment" concerning EPW
"would be of no further purpose or effect" MOL ¶33 and also ¶63 of the Amended Statement of
Claim dated November 10, 2006, for example;  after the February 1997 meeting, Defendant, so
he asserted, effectively withdrew from the Partnership, and so the argument runs, as I understand
it, all further work was EPW or the EPW provisions and others concerning matters that
Defendant Kenney did not like were inapplicable.

27.    It is clear that Defendant Kenney continues to maintain a position in these and the
related arbitral proceedings that is not supported by the PA.  In his Brief in Opposition to Motion
to Stay Arbitration, filed with the Appellate Division, First Judicial Department, Defendant said
this specifically:

> "Defendant – Respondent [Kenney] expressly alleges in this action that he and
> Mr. Becker, by both word and action did reach a new agreement which
> superseded the terms describing [EPW] in the First Amended Agreement [¶33]"

28.    Defendant Kenney's position could not be clearer with regard to his rewrite and
avoidance of the PA.  Any rewrite or amendment would have to be in writing to be effective
under *this* PA.  Any waiver of the provisions of the PA would similarly have to be in writing.
This Court can now understand why Defendant Kenney's cross-examination was a far from
pleasant experience for him.  There was no amendment, nor waiver of the PA, let alone reduced

11

to a writing (except as contained in the First and Second Amendments) that supports Defendant Kenney's many positions – oral agreement/s, waiver, new agreement, superseded agreement, effective withdrawal, EPW no longer effective.

29.    This fire storm is one with which Plaintiffs had to contend in dealing with matters that ranged far and widely from the PA.  These non-PA matters that Defendant Kenney has spread through these and related proceedings are not subject to arbitration and have no place occupying the time and resources of an arbitral proceeding.

**Kenney's Fire Storm on Estoppel and the Gymway Transactions, the Subject of the North Fork Subpoena**

30.    One of the wrongful defenses that Defendant Kenney raised relates to an estoppel to the extent that I can understand it Mr. Kenney says that I have knowledge of the commencement of his practice as a lawyer from late 2002.  In fact, he asserts, I acquiesced in his practice, and assisted him in various respects.  And, so therefore, Plaintiffs are estopped from asserting any EPW obligation under the PA and/or my knowledge of his practice means that he has complied with his EPW obligations.  (See ¶64-70 of Defendant's Amended Statement of Claim dated November 10, 2006)  One of the items that Defendant Kenney refers to as part of his estoppel argument in the Amended Statement of Claim and his original Statement of claim dated January 5, 2006 is that my knowledge (that purportedly relieves him of his duty to account for EPW) derives in part by the provision to him of a sub-account in Plaintiff Partnership's bank facilities "to facilitate the holding of some of [Defendant's] operating funds in New York" (¶22 of the Statement of Claim, Amended Statement of Claim ¶68)  Somehow my knowledge or facilitation, as alleged by Defendant, induced him "into reliance on the understanding that

12

[Plaintiffs] had no interest in the income from Mr. Kenney's" EPW (Amended Statement of Claim ¶68).

31.    Defendant's proposed exhibits included a set of faxes relating to wire transfer instructions from Defendant. This court will note that the beneficiaries in all instances that are exhibited here are Gymway Ltd and Gymway Holdings. Given the false predicate propounded by Defendant Kenney that Plaintiffs' involvement with these wire transfers amounted to full knowledge of clients and everything else that is required under the PA and in particular the EPW provisions, it was and is important to demonstrate to the arbitrator that these wire transfers had nothing to do with the nature, quality and extent of knowledge that Defendant Kenney has asserted and imputed to me. I knew that Defendant Kenney had some form of association with the Gymway entities. I did not know what the nature and extent of his current relationship were, nor indeed what these were at the time of the transfers in 2003.

32.    At some point in 2003, I stopped assisting Defendant Kenney with regard to the wire transfers that he was making. I was concerned about the propriety of these transactions. The proposed exhibits relating to those wire transfers show payments of invoices to the Gymway entities. Since Kenney's posit was false, Plaintiffs sought information concerning these invoices. Plaintiffs wanted information concerning the Gymway entities to show or to negate the proposition that these transactions were somehow connected with my knowledge of legal services and the legal services themselves. It was important to have Gymway's information at the arbitration hearing to determine and demonstrate that there was no connection with Defendant Kenney's provision of legal services as it may be imputed to any knowledge that I had that was relevant to *his* obligation to account under the PA.

13

33.    Upon information and belief counsel Latzman obtained an online search on November 13, 2007 that showed that Kenney was a director of Gymway and its prior name was Interclaim (Ireland) Ltd.  With regard to the current proceedings before this court, I did not recall such a direct connection between Gymway and Interclaim.  As Defendant Kenney had a significant volume of proposed exhibits dealing with Interclaim, it remained important that the Gymway disclosure be available at the arbitral hearing and that Defendant Kenney's false submissions could be dealt with.  This court will note that one of the important reasons for entering into the First Amendment (that forms part of the PA), was Defendant Kenney's efforts relating to the formation of an Interclaim entity.  This court will also note that, central to Kenney's rewrite of the PA, Interclaim is important because it relates to his leaving the active practice of law in 1997 and his relocation to Ireland for it.  Upon information and belief various Interclaim entities were formed.  There were significant litigation and difficulties presented by one Blair Down, which eventually lead to insolvency of one of the Interclaim entities in Ireland.

34.    I wanted to address the transactions between Defendant Kenney and Gymway, in particular dealing with the question that somehow these transactions are an indication that I knew he was performing specific legal services presumably in compliance with the PA.  I did not know or recall what function Gymway had until the hearing before the arbitrator, November 26, 2007.  At the hearing Kenney and counsel spoke of the Kenney relationship with Gymway, which was that he was sending money from his one pocket to another with regard to internal invoices reflecting the provision of *consulting services*.

35.    Further at the arbitral hearing and in response to one of the arbitrator's orders, Kenney produced provided (incomplete) documents in response to Plaintiffs' request relating to the Gymway invoices that are referenced in the wire transfers (exhibit 10).  The disclosure was

14

incomplete because there was no provision by Kenney of the underlying invoices or statements or descriptions of the services for which the wire transfers were purportedly made. Without providing the arbitrator with such documents, Kenney wrongly asserted that such invoices were subject to the attorney client privilege and he would therefore not produce them. He did not even give Plaintiffs the opportunity to make submissions or the arbitrator opportunity to review these documents.

36.    Contrary to Kenney's fire storm about how wrongful or improper the North Fork Subpoena was (relating as it did to the Gymway entity records), this court will now have a better understanding of a deception, and that deception was Kenney's, in ignoring the reasons for the North Fork Subpoena, the issues that relate to it and the Gymway and Interclaim entities, and Kenney's false arguments from the beginning of his Motion to Compel in January 2006, to the present, in various forums about these issues and the state and quality of my knowledge.

**Kenney's Fire Storm Approach to Arbitration Venue**

37.    Another fire storm that occupied many pages and much time before this court, the Supreme Court, New York County and the Appellate Division, related to the question of venue. It is clear that the dirty strategy that Kenney employed in this arbitration was to support a meritless claim (effective withdrawal, oral agreements, new agreements, etc.)with the selection of a venue that was and would have been all but impossible for the meaningful substantive functioning of any arbitral proceeding. Kenney selected venue of Miami from the beginning until that issue was disposed of by the arbitrator. Variously he said that venue in Miami was proper because he had a number of witnesses and records outside of the United States that he would need to use in the arbitration and that Miami was more convenient for him because he

would not have to spend as much time out of his office as it might be the case if her were to have to come to New York. Kenney went further in some of his filings. He said that none of the issues that were germane required New York witnesses. Needless to say it was Plaintiffs' recitation of the obvious from the beginning that any arbitral matter was only determinable in New York since all the potential witnesses and records resided in the metro area. While Defendant Kenney lost this important argument for himself, he gained an unusual situation. We have an arbitrator, resident in Florida, sitting in an arbitral proceeding in New York and being asked to opine on matters requiring knowledge of the substantive law of this State. Most importantly with regard to this fire storm is Defendant Kenney's bad faith in asserting Miami venue. He said:

> *"All of the legal matters to which Plaintiff claims and ownership interest in the Complaint arose and were performed outside of the United States, and all of the witnesses and evidence which may be reviewed by the arbitrator outside of the United States."* (Lilly Supplementary Affirmation in Opposition to Order to Show Cause ¶26, dated January 25, 2006)

38.     In Defendant's Brief in Opposition to Motion to Stay Arbitration dated March 14, 2006 (¶65) Kenney said that my assertions were erroneous that "... this is a New York dispute ... with New York books and records and New York witnesses and professional providers and all, but one of the parties, New York citizens and residents ... all witnesses essential to establishing plaintiff's write to an accounting as well as those referred to by Defendant in support of his claims, are New York residents". Further, in ¶66, Kenney says that he does not do business in New York, whereas at the arbitration hearing he admitted that he was the beneficial owner of the Gymway accounts at North Fork Bank and that he still maintained those accounts. It was a false statement for Mr. Kenney to represent what he said in said brief. Further, Mr. Kenney said:

371615.1 051744-37634

*"All witnesses, books and records relating to such legal services, which will presumably be demanded by Plaintiffs-Appellants in the event of discovery in this action or the Arbitration, are located outside of the United States. The Partnership's records and witnesses, all located in New York, will not be useful to an accounting of the services performed by Defendant-Respondent outside of the United States.:" ¶68*

39.    As late as Kenney's response to Plaintiffs' defense, please to jurisdiction, objection to venue and motion to dismiss, dated December 15, 2006, Kenney had this to say:

*"None of [Plaintiffs'] witnesses have (sic) any information or knowledge of the subject matter of the [Plaintiffs'] claims, namely, Mr. Kenney's foreign earnings for the sale of legal services. Furthermore, all of Mr. Kenney's witnesses, documents and records relating to such services are located outside of the United States. ... in order to determine whether such legal services constituted "joint work' or [EPW] [PA] the arbitrator will be required to examine Mr. Kenney's witnesses, documents and records relating to those legal services, and not [Plaintiff's] witnesses, documents and records which have no relevance to the legal services performed by Mr. Kenney and/or his employees outside of the United States." ¶28-29*

40.    Mr. Kenney is either not the seasoned litigator that he would have us believe or these submissions constitute vexatious and disingenuous submissions to confuse the issues, distract the true focus of the inquiry and commit by these assertions a fraud on the court and on the arbitrator.

## Kenney's Falsehoods Concerning the Medoff Meeting and Memorandum

41.    A principal firestorm that Defendant Kenney has propounded throughout these and related proceedings is the proposition that the February, 1997 meeting, as among Bernard Medoff, Esq., of Weiser LLP, Defendant Kenney and me, was reduced in writing only as to a portion of the overall agreement reached at that meeting. For example, in Defendant's Amended Statement of Claim Defendant states (¶16) that Mr. Medoff's memorandum, reflecting the items discussed and agreed at such meeting, only records "a portion of an oral agreement reached by the parties on 24th February, 1997." Throughout these proceedings, Defendant Kenney has tried

to suggest that the there were other terms and provisions to the "Oral Agreement", but he through the present time does not tell us what they were and how they can be effective and valid. Mr. Kenney goes further. He expressly states on page 35 of a motion brief that "the First Amendment does not accurately reflect the complete agreement between the partners, because, inter alia, the Oral Agreement…was made at the Meeting of the partners on February, 1997, and the Second Amendment…was subsequently executed by the parties". In Defendant's Statement of Claim, dated January 6, 2006, he says expressly that the "Second Amendment, in part, formerly memorializes a portion of an oral agreement reached by the parties on 24 February, 1997". (¶13) Again, in ¶42 of said Statement of Claim Defendant continues: "implicit in the tenor of this oral agreement [February, 1997} recorded, *in part*, by the [Medoff] memorandum…the respondents [Plaintiffs] have advanced a tortured construction of the meaning of the oral agreement of the parties of 19 February, 1997 – as embodied, *in part*, by the [Medoff] memorandum". A high point of Defendant's gaming these and related proceedings, with respect to the February, 1997, meeting and the Medoff memorandum is to be found in his second affidavit in support of motion staying action and compelling arbitration, dated February 6, 2006, in which in ¶8 Kenney says that "highlights of [the 1997 meeting] were later reduced to a memorandum".

42.    Lest this court think that this issue of "highlights" or partial agreements has gone away, Defendant asserted in his amended Statement of Claim that (¶16) the Medoff memorandum "formerly memorializes a portion of an oral agreement" reached at the meeting with Mr. Medoff.

43.    What does Mr. Medoff say? After Mr. Medoff attended the February 24, 1997, meeting with Defendant Kenney and me, he reduced all the issues to a memorandum and sent it

18

to both of us with a cover note. That cover note stated that if he had erred in any respect, we should point such error out to him.(exhibit 14). At the arbitration hearing to which Mr. Medoff was called on Wednesday, November 28, 2007, Mr. Medoff repeatedly stated that everything that had been agreed to by the parties at the meeting with him in February 1997, was recorded in his memorandum. If he had made any error, the parties were invited to tell him so and neither party from then through the present time did so. There were no other issues agreed other than those set out in the memorandum, so Mr. Medoff testified.

44.    Apart from the unavoidable inference that Defendant has repeatedly lied about what transpired at the Medoff meeting and the content of the memorandum, Plaintiffs offer this illustration of Kenney's firestorm that has occupied time and resources in these and related proceedings. Again, Plaintiffs refer to the collateral improper purpose (to muddle the issues, to open up argument streams, to waste time, to incur costs) with respect to which this issue was employed.

**Kenney's Falsehoods in the Legal Fees Case**

45.    In the Legal Fees case, the Plaintiff partnership had to institute action in April, 2005, against Defendant Kenney for legal services performed for him personally. The sum claimed approximately $50,000 which, with accrued interest unpaid on this sum, has a value of approximately $80,000. Mr. Kenney's reaction to the suit was to oppose it, say that it was wrong and vexatious, and he offered an interesting affirmative defense. That defense was, in summary to the extent I can understand it, that at a certain point during that representation (October, 2001) he and I agreed that fees owing at that moment would be extinguished and that fees incurred

from that point forward would not be owing by Defendant Kenney but claimable from a third party.

46.    The contemporaneous documentation and the facts do not support Mr. Kenney's "story" but Plaintiff was fortunate earlier this year in the course of the Legal Fees case litigation, to find a contemporaneous note of a conversation that an associate of Plaintiff partnership had with Mr. Kenney concerning, inter alia, by his own admission his liability for the fees that the Plaintiff partnership claimed by its suit. I set out the relevant portion of the file note: **"recover $ from M. Davis…apply to ESB's bill…accrued balance: let him [Kenney] know…every intention to pay bill when in position to do so"** (Exhibit 16).

47.    This conversation contrasts with the "story" that Defendant Kenney propagated in his verified answer as well as at his deposition on April 17, 2007, in which Mr. Kenney said, for example, (Exhibit 15, pp35, ll17ff) "It changed whereby Mr. Becker wanted to proceed with the arbitration against Mr. Aviv at a time when Mr. Cohen and I wanted to end the case. And Mr. Becker was very firm about his views that the case should proceed, and he said that he would want to proceed against Aviv and collect the fees that were owed against Aviv under a legal fee shifting rule in the arbitration proceedings that each of us believed applied to the arbitration" (exhibit 15).

48.    Mr. Kenney was very firm about his lack of liability to the plaintiff partnership for the fees for legal services rendered as he continued (Exhibit 15, ppg. 38-15 – 39-9): "Q: Okay. And the $45 an hour differential, is that still on? A: No. Q: Why not? A: Because of the variance or change in the agreement that was made in October of 2001. Q: I'm not talking of legal services performed from October 2001 forward. I'm talking about the time period, the

371615.1 051744-37634

approximate two-year time period between the commencement of legal services in or about October, 1999 and October, 2001 when the agreement changed, as you testified. A: It altered – the amendment altered the entire agreement from the beginning of it. Q: So is it your testimony that the October, 2001 amendment retroactively altered the agreement back to the inception? A: Yes" (exhibit 15).

49.    Defendant Kenney continued with his falsehoods as follows (Kenney Dep. 52, l 17ff): "Well, something to the effect of that Eugene – Mr. Becker called me either just before or just after my receipt of this October 9th letter (indicating) to explain that he either was about to or just had sent a letter to me reflecting an increase on Mr. Harrris' hourly rate but that I was to ignore it, that it was just for the file so that when the attorney fee shifting rule might apply in our arbitration proceedings the true value from KBS' perspective of Mr. Harris' time would be charged to Mr. Aviv and Mr. Dodson." (Exhibit 15, ppg. 60, l 25ff) "I believe this bill was dated after the October 9, 2001 amendment to our agreement.  So the answer would be Mr. Aviv and Mr. Dodson were supposed to be paying this bill, as we saw it, if we were successful in the arbitration."  (Exhibit 15, ppg 70, l 4ff) "A: Prior to October, 2001, no; but because of the nature of the amendment then, yes." Q: After 2001, it's your testimony that the bills were paid in full because there were no amounts owing for legal services rendered; is that your testimony? A: To our account; but to Aviv and Dodson's account, we thought they would be paid by them" (exhibit 15).

## Kenney's Fire Storm About His Capital Account Deficit That He Said Was Not Owed

50.    On September 27, 2004, I called on Mr. Kenney to pay his deficit then subsisting in his capital account ($73,026) of the partnership.  Mr. Kenney's response was predictable – he

21

was purportedly surprised that he had a capital deficit. He again gamed the dialogue between us by creating a firestorm. Variously, he or his friend said I had assumed his 49% interest in February, 1997, so as to extinguish the deficit and/or the partnership's accountant had not known about the change in ownership percentages (from 50/50 to 99/1) and/or the accountant had not been aware of or accounted for certain matters that would have given a very different capital account figure.

51.     When I noted in an email to him on November 23, 2004, that I would be taking further action on this issue he suggested that Mr. Medoff review the relevant papers and notes concerning this issue and then make a determination. The net effect of this suggestion was that Defendant Kenney bought himself more than three months to continue to play with this issue and continuing leverage to attempt to obtain some advantage by his continued non-payment. In particular, he, by counsel, sought to obtain releases from Plaintiffs, since, he was, upon information and belief, well aware of his exposure to Plaintiffs for the legal fees (referenced herein) and his obligations with regard to the partnership agreement. Again, in a mediation role, Mr. Medoff disposed of the capital deficit issue. He found that Defendant Kenney was liable for the capital deficit subsisting in his account.

52.     Per se, the capital deficit issue was of a relatively short duration and was resolved (in favor of Plaintiffs). But Mr. Kenney's firestorm and misconduct need to be recounted here as emblematic of his serial dishonesty. Mr. Kenney had, eight years before, himself actively participated in the finalization of the specific partnership tax return from which the capital deficit issue sprung. In fact, he not only reviewed in 1998 a draft of the partnership return, for the 1997 tax year, but sent it to his personal accountant in Arizona. Then for each tax year subsequently (1998 onwards) Defendant Kenney admittedly received partnership K-1 forms relating to

plaintiff partnership return.  At no time did Defendant Kenney protest the accuracy of the K-1 forms.  At no time did he file any protest with the Internal Revenue Service concerning any inaccuracy in these forms and filings.  In fact, according to testimony that he gave at the arbitration hearing (November, 2007) Defendant Kenney did not file tax returns as,  upon information and belief, he was obliged to do, for all these years (1998 through 2003, I believe) until 2004.  Defendant Kenney just did not want to comply with his obligations to make up his capital deficit.  He created a firestorm.

   53.  Defendant's motion is contrary to the parties' agreement, unnecessary, and wholly without merit.

                   EUGENE S. BECKER

SWORN TO BEFORE ME THIS
14th DAY OF DECEMBER 2007

NOTARY PUBLIC

STEPHEN LATZMAN
Notary Public, State of New York
No. 02LA4618508
Qualified in Nassau County
Commission Expires Oct. 31, 20 0 8

23

371615.1 051744-37634

Exhibit 14

M.R.**Weiser**&Co.LLP

Certified Public Accountants
and Consultants

Offices in New York and New Jersey

135 West 50th Street
New York, NY 10020-1299
Tel 212 641-6700
Fax 212 641-6888

February 27, 1997


Messrs. Martin Kenney and
    Eugene Becker
Kenney Becker, Solicitors LLP
1 Penn Plaza (Suite 2414)
New York, NY 10119


Dear Martin and Eugene:

I am enclosing two copies of a memorandum relating the contents of my notes of our meeting of Monday evening, February 24, 1997. I hope that I have accurately recalled all of the details we talked about, but I am sure you will point out any errors or omissions.

I am personally very happy that all the effort we all put into this difficult matter has resulted in an amicable solution. Let me know if I have erred anywhere in the memo.


Sincerely,

Bernard Medoff
Enc.

A member of
**Moores
Rowland**
INTERNATIONAL
A worldwide association of independent accounting firms

**KENNEY BECKER, SOLICITORS LLP**
**MEMORANDUM OF A MEETING**
**AMONG MARTIN KENNEY, EUGENE BECKER, AND BERNARD MEDOFF**
**HELD AT THE OFFICE OF M.R. WEISER & CO LLP**
**ON THE EVENING OF**
**FEBRUARY 24, 1997**

1.   The operable cut-off date was settled at the close of business on February 19, 1997.

2.   The profit sharing and capital interests were to change from a 50/50 relationship to a 99/1 relationship in favor of Eugene.

3.   The following items will be handled as follows:

   a.  Accounts receivable outstanding at 2/19/97 will be split 50/50, as collected, less any costs of collection.  All personnel will complete submission of time sheets and expense reports through the period ended February 19, 1997 and the data will be input into the computer system.  An invoice will be rendered to each client as of that date.  A schedule of all receivables will then be produced from the system and will be reviewed by EB and MK.  A new bank account will be opened in the name of the partnership, and all receipts pertaining to the scheduled receivables will be deposited into the new account.  Distributions from the new account will be made to each party as available.  Certain receivables were identified as being appropriate for collection efforts, and counsel was to be retained on a contingency basis to attempt collection.  Such costs were to be apportioned equally between the parties.

   b.  Unbilled work in process, will not exist since all time and disbursements will be billed as of February 19, 1997.

   c. Cash in bank is an asset of the partnership to be shared 50/50 after reduction for payable items, or other items described below.

   d. Physical assets of the partnership were valued by the parties at $28,300. and MK was to get a credit for one-half thereof or $$14,150.00.  All assets thus remained assets of the ongoing firm.

   e. Unpaid bills.  EB is to prepare two schedules, one prorating the unpaid invoices between the pre- and post-February 19 date, and another prorating the invoices paid since January 1, 1997 between the pre- and post-February 19, 1997 date.  MK will review the schedule and bear the cost of one-half of the pre-February 19 expenses, by offset to amounts otherwise due to him.

   f. Collections of fees in excess of A/R and WIP (success fees) will be shared in the proportion that the pre-Feb 19 value of time put into an engagement bears to the total value of time put in, as compared to the post-February 19 value of time.  As an example, if pre-February 19 time amounted to $50,000 and the post-

Kenney Becker, Solicitors LLP
Meeting
February 24, 1997
Page 2

February 19 time amounted to $100,000, then one-third of the success fee would be attributable to pre-Feb 19 and MK would be entitled to 50% thereof and two-thirds would be attributable to the post-Feb 19 period, and MK would be entitled to 1% of that amount.

       g. KBS is entitled to be paid for MK's time expended on Interclaim matters from January 1, 1997 through February 19, 1997. It was agreed that MK expended approximately one hour per day for the thirty-six working days during that period. At a rate of $325.00, this amounted to $11,700. It was agreed that the $14,150 owed to MK for the physical assets would be reduced by $5,500 owed by Interclaim for MK's time, resulting in a net due to MK, for these matters of $8,650.00.

4. Subsequent to 2/19/97, KBS will charge Interclaim $250.00 per hour for MK work hours.

5. Subsequent to 2/19/97 KBS will charge Interclaim a reasonable charge for EB's work hours. Reasonable contemplates the amount of overhead included in EB's "normal" billing rate plus a profit. Each matter will be decided upon in advance, depending upon Interclaim's ability to pass on full costs or some reduced amount.

6. MK will work pursuant to a pre-arranged budget, determined by MK and EB before the work commences. MK will deliver an appropriate time sheet, together with a calculation showing the amount due. Such amount will be treated as a "special allocation" of income to MK, and will be removed from the net income of KBS before determining MK's 1% share. Payment will be treated as a draw against such profit.

7. The draft 1996 partnership income tax returns are to be reviewed with the preparer. An analysis of the respective drawing accounts of MK and EB is to be prepared so that the true and correct drawings are reflected, and the allocation of income between MK and EB is to reflect their actual understanding.

c:\winword\kbs\kbsagree.doc

# Exhibit 15

ORIGINAL

1

2    SUPREME COURT OF THE STATE OF NEW YORK

3    COUNTY OF NEW YORK

4    - - - - - - - - - - - - - - - - - - - - - - -x

5    KENNEY, BECKER, LLP,

6                    Plaintiff,

7                    Index No.

        -against-        104899/05

8

     MARTIN S. KENNEY and IRVING COHEN,

9

                    Defendants.

10

     - - - - - - - - - - - - - - - - - - - - - - -x

11

                    276 Fifth Avenue

12                  New York, New York

13                  April 17, 2007

                    10:10 a.m.

14

15

16

17              EXAMINATION BEFORE TRIAL of MARTIN S.

18   KENNEY, the Defendant herein, taken by the

19   Plaintiff, pursuant to Court Order, held at the

20   above-noted time and place before a Notary Public

21   of the State of New York.

22

23

24

25

2

1

2

3  A P P E A R A N C E S :

4

5  S T E P H E N   L A T Z M A N ,   E S Q .

Attorneys for Plaintiff

6        276 Fifth Avenue, Suite 306

New York, New York 10001

7

8

COHEN POPE, PLLC

9  Attorneys for Defendants

933 Mamaroneck Avenue, Suite 206

10       Mamaroneck, New York 10443

11  BY:    E S T H E R   T R A K I N S K I ,   E S Q .

12

13  A L S O   P R E S E N T :

14  Irving Cohen

Eugene Becker

15

16

17

18

19

20

21

22

23

24

25

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

3

1

2                    S T I P U L A T I O N S

3

4        IT IS HEREBY STIPULATED, by and between

5    the attorneys for the respective parties hereto,

6    that:

7        All rights provided by the C.P.L.R., and

8    Part 221 of the Uniform Rules for the Conduct of

9    Depositions, including the right to object to any

10   question, except as to form, or to move to strike

11   any testimony at this examination is reserved;

12   and in addition, the failure to object to any

13   question or to move to strike any testimony at

14   this examination shall not be a bar or waiver to

15   make such motion at, and is reserved to, the

16   trial of this action.

17        This deposition may be sworn to by the

18   witness being examined before a Notary Public

19   other than the Notary Public before whom this

20   examination was begun, but the failure to do so

21   or to return the original of this deposition to

22   counsel, shall not be deemed a waiver of the

23   rights provided by Rule 3116 of the C.P.L.R., and

24   shall be controlled thereby.  The filing of the

25   original of this deposition is waived.

4

1

2        IT IS FURTHER STIPULATED, that a copy of

3    this examination shall be furnished to the

4    attorney for the witness being examined

5    without charge.

6    M A R T I N   S.   K E N N E Y,

7            the Defendant herein, having first been

8            duly sworn by Ellen Katz, a CRR, RPR and a

9            Notary Public in and for the State of New

10           York, was examined and testified as

11           follows:

12   EXAMINATION BY

13   MR. LATZMAN:

14       Q.   Would you please state your name for

15   the record.

16       A.   Martin S. Kenney.

17       Q.   Where do you reside?

18       A.   Eyrie House Greenbank Estate,

19   Tortola, British Virgin Islands, British West

20   Indies.

21           MR. LATZMAN:  Would you please mark

22       these as Plaintiff's Exhibit 1 and 2 with

23       today's date.

24           MS. TRAKINSKI:  Do you want to

25       continue with the numbers?

ALLIANCE REPORTING SERVICE, INC. (516) 741-7585

35

MARTIN S. KENNEY

1

2      Q.    Was there a writing that you composed

3  which set forth an $80 hourly rate?

4      A.    I can recall preparing a fax that

5  confirmed a discussion reflecting that oral

6  agreement, yes.

7      Q.    When you say initially it was agreed,

8  did the agreement change at some point?

9      A.    Yes.

10     Q.    When?

11     A.    In October, 2001 or thereabouts.

12     Q.    How did the agreement change?

13     A.    At the time, as I recall, there was

14 some developments in the arbitration that led to

15 the change in the agreement.

16     Q.    How did the agreement change?

17     A.    It changed whereby Mr. Becker wanted

18 to proceed with the arbitration against Mr. Aviv

19 at a time when Mr. Cohen and I wanted to end the

20 case.  And Mr. Becker was very firm about his

21 views that the case should proceed, and he said

22 that he would want to proceed against Aviv and

23 collect the fees that were owed against Aviv

24 under a legal fee shifting rule in the

25 arbitration proceedings that each of us believed

36

MARTIN S. KENNEY

1

2  applied to the arbitration.

3      Q.    How did that agreement alter the

4  amount of the amounts that you were required to

5  pay to plaintiff for legal services?

6      A.    Well, it altered it in the sense that

7  we were then -- we had agreed only to pay the

8  disbursements that were incurred on a monthly

9  basis, which we did, as I recall.

10      Q.    Was this change of agreement

11  memorialized in a writing?

12      A.    Parts of it, as I recall.

13      Q.    In preparation of today's deposition,

14  did you review any documents?

15      A.    Yes.

16      Q.    What documents did you review?

17      A.    Invoices and faxes concerning this

18  matter.

19      Q.    Do you have those documents with you

20  today?

21      A.    No.

22      Q.    Referring to Exhibit 23 in front of

23  you, the hourly rate is listed as $125.  Based on

24  your prior testimony, that's not in accordance

25  with your agreement; is that correct?

37

MARTIN S. KENNEY

1

2      A.    Well, there were two elements to the

3  hourly rate; one was an agreement to pay $80 per

4  hour on a current basis and the balance down the

5  road, quote, whenever, literally whenever.

6      Q.    What was the purpose of deferring $45

7  an hour?

8      A.    I think all parties concerned

9  recognized that the claimants, me in particular,

10  were under financial distress at the time and we

11  couldn't pay the or at least I couldn't pay the

12  full hourly rate, as requested.

13      Q.    When was the remaining portion of $45

14  to be paid under this agreement?

15      A.    As I think I outlined before, it was

16  literally characterized with the word "whenever;"

17  and I believe that the understanding between us

18  was it would be paid as and when we could pay.

19      Q.    When you were financially able to

20  pay?

21      A.    Correct.

22      Q.    Did the $45 differential, the 45

23  hourly differential, was that based on a success

24  component in the arbitration?

25      A.    No.

38

MARTIN S. KENNEY

Q.   Was there ever a forgiveness made by plaintiff as to this $45 differential, 45 an hour differential?

A.   Well, there was in the sense of the agreement that was reached in October, 2001 for KBS to seek monies owed from Mr. Aviv through this fee shifting rule that we thought applied.

Q.   The time period between the commencement of legal services by plaintiff on your behalf, which was in October or so of 1999 and October, 2001, you're operating under the initial agreement, correct?

A.   Yes.

Q.   Okay.  And the $45 an hour differential, is that still on?

A.   No.

Q.   Why not?

A.   Because of the variance or change in the agreement that was made in October of 2001.

Q.   I'm not talking of legal services performed from October, 2001 forward.  I'm talking about the time period, the approximate two-year time period between the commencement of legal services in or about October, 1999 and

39

1                      M A R T I N   S.   K E N N E Y

2    October, 2001 when the agreement changed, as you

3    testified.

4         A.    It altered -- the amendment altered

5    the entire agreement from the beginning of it.

6         Q.    So is it your testimony that the

7    October, 2001 amendment retroactively altered the

8    agreement back to the inception?

9         A.    Yes.

10         MS. TRAKINSKI:  I object to the form.

11         MR. LATZMAN:  The witness answered

12    the question.

13         MS. TRAKINSKI:  You know what, Steve,

14    I'm allowed to put my objections to form on

15    the record.

16         MR. LATZMAN:  So you did.

17         MS. TRAKINSKI:  I know I did and

18    you're the one who started with lambasting

19    me.  Go on.  Next question.

20         You have to give me a chance to

21    object.

22         MR. LATZMAN:  Do you have his "yes"

23    on the record.

24         [Whereupon, the requested portion of

25    the record was read.]

ALLIANCE REPORTING SERVICE, INC. (516) 741-7585

52

MARTIN S. KENNEY

1

2    A.    I believe so, yes.

3    Q.    What did you say to Mr. Cohen

4    concerning this attached letter?

5    A.    I relayed to him the substance of a

6    conversation I had had with Eugene about the

7    letter -- with Mr. Becker, I should say.

8    Q.    What did he say to you?

9    A.    I just recall discussing I was simply

10   relaying what Mr. Becker and I spoke about.  I

11   recall that was the purpose of the discussion.

12   Q.    What did you say to Mr. Cohen?

13   A.    I just explained what my discussion

14   was about with Mr. Becker.

15   Q.    Okay.  Well, what did you say to him?

16   I mean, what were your words?

17   A.    Well, something to the effect of that

18   Eugene -- Mr. Becker called me either just before

19   or just after my receipt of this October 9th

20   letter (indicating) to explain that he either was

21   about to or just had sent a letter to me

22   reflecting an increase on Mr. Harris' hourly rate

23   but that I was to ignore it, that it was just for

24   the file so that when the attorney fee shifting

25   rule might apply in our arbitration proceedings,

53

1                   M A R T I N   S.   K E N N E Y

2    the true value from KBS' perspective of

3    Mr. Harris' time would be charged to Mr. Aviv and

4    Mr. Dodson.

5         Q.    What's the source of this attorney

6    fee shifting rule that you refer to?

7         A.    Everyone involved in this case

8    understood at the relevant time that there was a

9    rule in the International Commercial Arbitration

10   Rules of the American Arbitration Association

11   that provides an Arbitrator operating under those

12   rules with the power to shift the cost and the

13   risk of legal fees from the successful party to

14   the unsuccessful party for the successful party's

15   fees.  We call it the "English costs rule" where

16   the successful party gets his fees paid by the

17   unsuccessful party.

18        Q.    Was that request made of the

19   Arbitrator in the Aviv proceeding?

20        A.    Yes.  It was a -- it was made of him,

21   yes.

22        Q.    What was the Arbitrator's ruling on

23   that request?

24        A.    I think, as I eluded to before,

25   Mr. Latzman, he concluded that on the crucial

60

1          MARTIN S. KENNEY

2          Q.    She writes (reading) Dear Eugene and

3    Alan, one, was this bill before the rates were

4    amended?  What should I pay?

5          A.    Yes.

6          Q.    Do you see that?

7          A.    Yes.

8          Q.    Was any amount owing by you and

9    Mr. Cohen under this invoice dated October 22,

10   2001?

11         A.    Yes --

12              MS. TRAKINSKI:  I object to the form.

13         A.    -- as to disbursements only, but I

14   don't see any disbursements billed in this

15   particular bill.

16         Q.    I'll repeat the question.  Was any

17   amount owing to the plaintiff by you and

18   Mr. Cohen under the invoice dated October 22,

19   2001?

20              MS. TRAKINSKI:  I object to the form.

21         You asked it and he answered it.

22              MR. LATZMAN:  No, he did not.

23              MS. TRAKINSKI:  You want to answer it

24         again, go ahead.

25         A.    I believe this bill was dated after

61

MARTIN S. KENNEY

1

2  the October 9, 2001 amendment to our agreement.

3          So the answer would be Mr. Aviv and

4  Mr. Dodson were supposed to be paying this bill,

5  as we saw it, if we were successful in the

6  arbitration.

7          Q.   Are you related to a Deirdre Kenney?

8          A.   Yes.

9          Q.   Is she your wife?

10         A.   Yes.

11         Q.   Did she have knowledge of the

12  October, 2001 modified agreement with plaintiff

13  for legal services?

14             MS. TRAKINSKI:  I object to the form.

15         At what point in time?

16             MR. LATZMAN:  At any point in time.

17             MS. TRAKINSKI:  You may answer.

18         A.   Yes.

19         Q.   When did she become aware of the

20  modified agreement?

21         A.   Subsequent to this -- the day of this

22  fax, I believe.

23         Q.   How did she become aware?

24         A.   Through discussions with me and

25  perhaps others.

70

1              MARTIN S. KENNEY

2          MS. TRAKINSKI:  I object to the form.

3      Argumentative.  You can answer.

4          A.    Prior to October, 2001, no; but

5      because of the nature of the amendment then, yes.

6          Q.    After 2001, it's your testimony that

7      the bills were paid in full because there were no

8      amounts owing for legal services rendered; is

9      that your testimony?

10         A.    To our account; but to Aviv and

11     Dodson's account, we thought they would be paid

12     by them.

13         Q.    But there's no writing reflecting

14     that, other than the October 9, 2001

15     correspondence, which has been marked as

16     Exhibit 23; is that correct?

17             MS. TRAKINSKI:  It's not Exhibit 23.

18             MR. LATZMAN:  This has been marked

19         as -- there's a question.

20             MS. TRAKINSKI:  I know.  I stopped.

21             MR. LATZMAN:  You stopped before

22         words came out of your mouth?

23             MS. TRAKINSKI:  It's none of your

24         business.

25             MR. LATZMAN:  It is my business.

# Exhibit 16

PLAINTIFF'S
EXHIBIT
N
51597

T/C   MSK                          7/9/02

— I.C. + he spoke                      25    K:35
                                                  :45
                                                  :50
                                                  :04

— 2 or 3 reasons. why

— Any role sense to Deep freeze. Case

— this and: basically conservative.

— went thru { file
              evid
              decs'y

— scope of
  arb. provision } extra contractual
                    claims: colorful.

— general trend: exclusive reading of
  such provisions: policy reasons:
              ct's overloaded: too $'s

— Judges kick em when they can

②

— that arb clause is intentionally broadly ~~drafted~~ worded

— ges trend + language wd include extra 'K' ual c/n's,

BUT

my ~~pos~~ read: no. Davison view key point

e.g.
— atty fee's

~~[~~ what rules apply: ignored ← moving to Ireland
living Ireland.

— ~~glossaed~~ / mature / practitioner /

— banker / lawyer / Citibk.  / very conservtve.

— tort claim / defamation / not a shareholder case;

— wd are all ← ltd resources
busy

③



— w/o impudent to proceed.

— "Never concede anything": ESB: rock in road:

— both sides o/s M's T.D.

— propose cessation of all proceedings

— recover $ from Mr. Davis ⟩

— apply to ESB's bill

— accrued balance: let him know

— every intention to pay bill when in position to do so.

— As will I C.

— He'll be moved to do so when I do.

— cess of activities

— each side w/ D's MTN's as
      they stand

— bring it to a halt.

— d/m red formalities.

— injunction D/S: it's an order's inj. "NOT
      contempt of ct. if wrongdoing,
            proceed on wrongdoing
                  NOT inj.